(No. 13474.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ABRAHAM SCHALLMAN, Plaintiff in Error.

*Opinion filed December 21, 1920—Rehearing denied Feb. 2, 1921.*

1. CRIMINAL LAW—*when fact that defendant purchased property at very low price tends to prove knowledge that it was stolen.* In a trial for receiving stolen property, evidence that the defendant purchased the property, consisting of a large quantity of silk, at a price far below its market value, from a clerk who worked in a store where he had access to the silk, tends to prove that the purchaser knew the property had been stolen. ·

2. SAME—*fact that witness was an accomplice affects credibility but not the competency of his testimony.* An accomplice is a competent witness and a conviction may be had on his uncorroborated testimony, but the·fact of his being an accomplice is a matter affecting his credibility, and his uncorroborated testimony should be acted upon with the utmost caution.

3. SAME—*plaintiff in error should show wherein ruling is error.* One who assigns error should show wherein the ruling of the court is wrong, and the mere statement that a ruling is error, without giving the ground for such contention, is neither helpful to the court nor advantageous to the plaintiff in error.

4. SAME—*when stolen property need not be produced on the trial to prove value.* In a trial for receiving stolen goods, consisting of a large quantity of merchantable silk, it is not error to refuse to require the silk to be produced on the trial as evidence of its value at the time the defendant purchased it, where the defendant examined the silk while it was in his possession but offered no testimony contradicting that of the People concerning its value.

5. SAME—*when delay in issuing mittimus does not render sentence void.* A delay of fifteen months between imposing sentence and issuing the *mittimus* does not render the sentence void, where it appears that orders extending the time for filing the bill of exceptions were made in regular form from time to time while the court had jurisdiction and that orders were entered staying the *mittimus* for like periods of time with the consent of the defendant and evidently for his benefit.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

STEDMAN, SOELKE & JOHNSON, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and NOAH C. BAINUM, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of receiving stolen property of the value of $1200. Motions for new trial and in arrest of judgment were overruled and plaintiff in error was sentenced to the penitentiary on January 18, 1919. Time for filing a bill of exceptions was extended from time to time and *mittimus* stayed by the court upon appearance and by agreement of the respective attorneys for the parties hereto, such stay orders corresponding with the various extensions of time for the bill of exceptions. *Mittimus* was finally issued on May 5, 1920.

The evidence in the record tends to show that Charles Hoffman, who was at the time of the hearing of this cause twenty-eight years of age, had been employed as salesman in the lining department of Marshall Field & Co.'s wholesale store in Chicago at a salary of $12 per week. As such salesman it was his duty to act as pick-up buyer, by purchasing such articles from other dealers as were necessary to complete orders of customers, and to wait on customers in the lining department, which was located across the aisle from and opposite to the silk department. He had nothing to do with the silk department. A large quantity of silk had disappeared from the silk department unaccounted for, and Hoffman was suspected of having stolen it. As he left the store in June, 1913, he was followed by a detective named Hopper to the Medinah Temple building, across the street, where he had a room on the tenth floor. Hopper arrested him in said building and found concealed under his coat a bolt of silk that he had stolen from his employer.

295—36

He had rented this room in the Medinah Temple some time prior to his arrest. He had a sign on the door of the room which read: "C. Hoffman & Co., Jobbers in Silks and Satins.—Charles Hoffman and M. Walbaum, Representatives." M. Walbaum was his stenographer during that time. She testified that she had no interest in the business and that her name appeared on the door at Hoffman's request; that she had no knowledge of where the goods came from or the circumstances under which Hoffman acquired the same; that the goods usually came in when she was out to lunch.

Prior to the first trial of this case Hoffman had been indicted for larceny and on a plea of guilty had been sentenced to the penitentiary, where he was imprisoned at the time of the first trial. He was called as a witness on the first trial but refused to answer any questions touching the guilt of plaintiff in error. The cause came to this court on writ of error, and the judgment was reversed and the cause remanded for errors on the trial but without passing on the merits of the case. (*People* v. *Schallman,* 273 Ill. 564.) At the time of the present trial Hoffman had been paroled, and when called as a witness on behalf of the People he testified that he first met Schallman in the place of his (Hoffman's) employment; that Schallman came into the department where he was employed during the noon hour, when most of the salesmen were out to lunch and when witness and Schallman were about the only people in the department; that Schallman looked at a job-lot of goods, and after debating a considerable time with reference to the price finally stated that he would purchase them; that Schallman offered him five dollars if he would reduce the price marked on the goods and send them to him at about a cent and a half or two cents per yard cheaper than they were marked; that this incident caused him to believe that Schallman would buy stolen silks; that occasionally Schallman came into the lining department and talked to him with reference to silk; that on one of these occasions

he told Schallman that he had a particular friend who was overloaded with a bunch of silk and wanted to get rid of it and thought it could be purchased at a very reasonable price; that Schallman requested witness to furnish samples to him and find out the price; that he cut the samples off the bolts of silk which he had taken from the silk department and hidden in the lining department and took these samples to Schallman and quoted him a price of fifty cents a yard; that he did not know at that time that Schallman was in the silk business; that he carried four bolts of black messaline silk to Schallman, who gave him the sum of $80 for them; that about two weeks thereafter a second conversation was had between him and Schallman in the lining department at Hoffman's place of employment; that at this time witness told Schallman that he could get some more of the silk like that previously delivered if he could use it, to which Schallman replied, "Yes;" that thereupon he stole four more bolts of 36-inch messaline silk in substantially the same manner as the others had been taken and sold them to Schallman for approximately the same money; that after the second sale he received $10 per bolt instead of $20; that these dealings were continued until some 500 bolts were delivered to Schallman, either personally or by messenger; that in May he informed Schallman that boys had been caught stealing in the silk department and that they were watching the department pretty closely and he would have to stop stealing silk for awhile, which he did for two weeks; that thereafter he had a conversation with Schallman in which Schallman stated that a particular customer of his wanted a few more bolts of messaline silk and asked witness if he could not get them, to which the witness replied that he could; that he did take ten more bolts, for which Schallman paid him $100. Hoffman testified that he usually took the bolts from the silk department and hid them in the lining department until the noon hour, at which time, after removing the original wrapper and re-

wrapping the package in plain paper, he secreted the bolts of messaline under his coat and left the building, thereby deceiving the watchman whose duty it was to observe the employees as they left the building.

Plaintiff in error contends that there is no evidence in the record, independent of the testimony of Hoffman, proving or tending to prove that the plaintiff in error knew at the time the goods were purchased that they were stolen goods; that the testimony other than that of Hoffman tends to prove the contrary. Mabel Walbaum, who was called as a witness for the People, testified that she had been employed by Hoffman in the office where he purported to conduct a silk jobber's business; that Hoffman had no billheads or letter-heads; that she made out no bills to anyone; that Hoffman had no customers who came to the office, so far as she saw; that she had never seen plaintiff in error in Hoffman's office; that upon the arrest of Hoffman the detective, Hopper, came to the office and while there pointed out plaintiff in error walking up the stairway from the ninth to the tenth floor of the building in which the office of Hoffman was located; that she had nothing to do with the getting of the silk and knew nothing about it. George Hurley, a witness for the People, testified that he worked around the Medinah Temple; that he delivered numerous packages to the plaintiff in error from Hoffman; that he never saw anyone other than Miss Walbaum in Hoffman's office. Frank St. Clair testified that he was a teamster; that he knew Hoffman and Schallman, and that he made three or four trips from Hoffman to Schallman with his wagon in which he took packages; that he never delivered a bill or invoice to Schallman; that the packages were of sufficient size to require the use of his wagon to move them. Dennis Hayes testified to taking goods for Hoffman from the tenth floor in the Medinah Temple to Schallman in his delivery wagon. The testimony of Ferdinand Bischoff, an employee of Marshall Field & Co., was

to the effect that upon the arrest of Hoffman he went to the place of business of the plaintiff in error and identified eight bolts of silk in possession of Schallman as the property of Marshall Field & Co.; that this silk was taken from Schallman and turned over to Marshall Field & Co.; that the eight bolts contained about 500 yards of silk, of the value of at least fifty cents per yard. Hopper, the detective, testified that after the arrest of Hoffman witness said to plaintiff in error, "You got some of that silk pretty cheap,— about $10 a bolt," and that Schallman replied, "I am in the jobbing business, and I would buy it for $10 if I could," to which Hopper replied, "You know that young man was working in Marshall Field's as a clerk," and Schallman said "Yes." Hopper also testified that he had a conversation with plaintiff in error in which he charged him with having bought 600 bolts of silk and paying $6000 for it, to which Schallman replied, "I did not pay more than $1200 for it."

The testimony of Hopper and Bischoff tends to corroborate Hoffman as to the value of the silk, and the fact, which was not denied by plaintiff in error to Hopper, that he had purchased the silk at a price far below its market value. These facts tend to prove that the plaintiff in error knew the silk was stolen and to corroborate Hoffman in that particular. Plaintiff in error took the stand and denied all testimony of the State tending to show knowledge on his part of the theft and declared that he purchased the silk from Hoffman at a fair price. The jury heard all the evidence, and plaintiff in error's guilty knowledge was an issue they were called upon to decide. We are of the opinion that the jury were justified in deciding it as they did. It is inconceivable that a man in the silk jobbing business could purchase large quantities of silk from a clerk working on a salary of $12 per week for less than half the market price of the silk and still be unaware of its having been stolen.

Plaintiff in error's contention that Hoffman's testimony is uncorroborated cannot be sustained. It is the rule that an accomplice is a competent witness and a conviction may be had on his uncorroborated testimony, and the fact of his being such accomplice is a matter affecting the credibility rather than the competency of such testimony, but such uncorroborated testimony should be acted upon with the utmost caution. (*People* v. *Feinberg,* 237 Ill. 348; *People* v. *Baskin,* 254 id. 509.) We are of the opinion, however, that there is much in the record which tends to corroborate the statement of Hoffman.

Plaintiff in error also contends that the court erred in its rulings concerning the admissibility of evidence. The greater part of these objections, however, do not point out the objectionable feature of the testimony complained of or wherein the ruling of the court was error. In some he does not designate the particular testimony which he considers objectionable. The mere statement that a ruling is error, without giving the ground for such contention, is neither helpful to the court nor advantageous to plaintiff in error. We have gone over the record concerning all the objections, however, and are of the opinion that there is no reversible error in the court's rulings concerning the admissibility of testimony.

Plaintiff in error contends it was error to refuse to require the production of the silk in question for examination on the trial. The testimony shows that this silk would have become practically worthless if kept until the time of the trial of this case. Moreover, we are of the opinion that it was not necessary that it should be kept. The plaintiff in error had had it in his possession, and it was seen and examined and its quality and value subjected to proof. Furthermore, there was no testimony contradicting that of the State concerning its value.

Plaintiff in error also complains of the conduct of the State's attorney and of the court in the trial of the cause.

We have read the abstract in connection with these objections and find no reason for disturbing the verdict on that ground.

Plaintiff in error's next contention is that the verdict was not sustained by the evidence as to the value of the silk stolen; that the jury brought in a verdict fixing the value of the property at $2000, whereas there was no single transaction showing a value of over $200. An examination of plaintiff in error's abstract shows the value of the property stolen to have been fixed at $1200 by the jury's verdict. The amount of the silk stolen and delivered to plaintiff in error appears to have been shown on the trial without objection on the part of plaintiff in error that separate transactions should be considered as constituting separate offenses, nor was there any request to require the State to elect the transaction upon which the State would predicate its case. The testimony shows the value of the eight bolts taken from the possession of Schallman to have been $250. Plaintiff in error in his testimony admits that the value of the first silk he received from Hoffman was above $80. It will be seen that from either viewpoint the theft of the silk amounted to grand larceny. The indictment charges plaintiff in error with receiving stolen silk to the amount of 35,000 yards, of the value of fifty cents per yard, knowing it to have been stolen, and that he prevented the return of said goods to the rightful owner.

Plaintiff in error's next contention is that the sentence is void on account of unreasonable delay in the issuance of a *mittimus*. Sentence was imposed on the 18th day of January, 1919, and the *mittimus* was finally issued on May 5, 1920. It appears that from time to time extensions were granted for the purpose of preparing and examining the bill of exceptions, and orders were entered staying the *mittimus* for like periods of time; that this continued until the 5th day of May, 1920, when the *mittimus* was finally issued. Plaintiff in error urges that notwithstanding these

extensions of time for filing the bill of exceptions, and orders staying the *mittimus* for like periods of time, were had by agreement of plaintiff in error, nevertheless the delay has been so unreasonable as to make the judgment void; that the bill of exceptions was presented and taken by the State's attorney for examination, and that such orders extending the time for filing the bill of exceptions were made because the State's attorney had not completed his examination of it. It appears that the orders extending the time for filing the bill of exceptions were made in regular form and while the court had jurisdiction to do so. There appears to be no reason why the State should be interested in staying the *mittimus* even though extensions were granted from time to time for the purpose of completing the examination of the bill of exceptions. The staying of the *mittimus* was solely for the benefit of the plaintiff in error, and the record shows that he agreed thereto. It is the rule that if the issuance of the *mittimus* is suspended for an unreasonable length of time the court loses jurisdiction to enforce it. It was held in *People* v. *Leinecke,* 290 Ill. 560, that a defendant in a criminal case cannot be subjected to the mere caprice of a judge, and the staying of a *mittimus* for an unreasonable time deprives the court of jurisdiction. In this case, however, the orders staying the *mittimus* for periods of time corresponding to the extensions of time for filing the bill of exceptions were evidently for the benefit of the plaintiff in error, and it appears to have been done in order to give him an opportunity to secure a *supersedeas* and thus avoid enforcement of the judgment against him before final hearing in this court, and not at the caprice of the judge but on plaintiff in error's agreement and evidently for his benefit. We are of the opinion that while the delay here was much longer than was necessary, yet under the facts of the case it was not such as to destroy the judgment.

We find no reversible error in the record. The judgment of the criminal court will therefore be affirmed.

*Judgment affirmed.*